**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   DORA BAIRES, et al.,                        No. C 09-5171 CRB

12              Plaintiffs,                       **ORDER DISMISSING WITHOUT PREJUDICE**

13        v.

14   THE UNITED STATES OF AMERICA,
     et al.,
15

16              Defendants.
                                              /
17

18        Plaintiffs Juan Carlos Baires, represented in this action by his mother Dora, and

19   Teofilo Miranda allege a horrifying sequence of events regarding their treatment while in

20   custody for immigration violations.  Juan Carlos Baires died while in custody of

21   complications relating to Human Immunodeficiency Virus ("HIV"), and his mother sues

22   based upon the events leading up to his death.  Miranda, who is also HIV positive, sues based

23   upon similar medical mistreatment that lead to serious, though ultimately non-fatal,

24   complications from his disease.

25        Both Plaintiffs sue a variety of defendants, including the doctors who failed to

26   properly treat them, the Lerdo Detention Facility where they were housed pursuant to a

27   contract with the federal government, the Kern Medical Center where they were seen by

28   physicians who failed to treat their illnesses, Kern County itself, and a number of federal

1  defendants.  The federal defendants include the United States of America, the Department of

2  Homeland Security ("DHS"), the United States Immigration and Customs Enforcement

3  ("ICE"), the Division of Immigration Health Services ("DIHS"), and various individual

4  federal employees.

5       The federal parties all move to dismiss.  For the reasons that follow, the motions are

6  GRANTED without prejudice.  First, the First Amended Complaint ("FAC") as it is currently

7  drafted fails to allege a connection between the wrongdoing of various federal actors and the

8  injuries suffered by Plaintiffs.[1]  As explained more thoroughly below, while the FAC devotes

9  many paragraphs to describing inadequate federal policies, the facts alleged do not suggest

10  that the federal policies caused the harm suffered by plaintiffs.  On the contrary, the callous

11  behavior alleged in the FAC appears to be entirely independent of the policies in question.

12  Either Plaintiffs must allege some different policy that is implicated by the facts alleged, or

13  they must allege some factual connection between the policies and the mistreatment.

14  Second, the FAC fails to allege facts to support the conclusion that the individuals charged

15  with providing medical care to plaintiffs were federal employees.  Instead, the FAC and an

16  incorporated document reflect the fact that these individuals operated as independent

17  contractors.  The federal government is not liable for torts committed by independent

18  contractors, nor can federal officials be held vicariously liable under Bivens.

19       For these reasons, the motions to dismiss are GRANTED without prejudice.

**Background**

21  **I.      The Immigration Detention System**

22       The FAC begins with a series of allegations regarding the immigration detention

23  system.  Plaintiffs allege that ICE operates the largest detention system in the country, with a

24  total of 378,582 aliens held in custody in 2008.  FAC ¶ 43.  While individuals are held in ICE

25  custody, the U.S. Public Health Service "provides medical, surgical, psychiatric, and dental

26

27       [1]  Most of the individual federal defendants are policy-makers rather than individuals who
interacted personally with Plaintiffs.  The FAC does, however, sue various unnamed ICE agents who
28  came into contact with Plaintiffs in California.  As explained below, the analyses with regard to these
two categories of defendants are different.

*United States District Court*
For the Northern District of California

**United States District Court**
For the Northern District of California

1  care to immigration detainees in the United States pursuant to federal law." Id. ¶ 46.

2  "However, ICE is ultimately responsible for ensuring the safe and humane conditions of

3  confinement for aliens in federal custody, including the provision of reliable, consistent and

4  appropriate medical services." Id.

5      The Detention Standards for Medical Care, established by ICE in 2000, "require ICE

6  facilities to take various precautionary measures to prevent health care emergencies.  For

7  instance, the Standards mandate that every ICE detainee undergo a basic health screening

8  within the first 24 hours of admission to an ICE detention facility." Id. ¶ 48.  "[I]ndividuals

9  who have acute or chronic healthcare needs must be referred to a primary care provider for

10  medical treatment." Id. ¶ 49.  "Patients with diseases such as HIV/AIDS must be treated in

11  accordance with nationally recognized standards and guidelines.  Each detainee who is

12  diagnosed with a chronic-care issue must receive appropriate and coordinated specialized

13  care consistent with community standards." Id. ¶ 49.  Plaintiffs allege that, notwithstanding

14  this policy, various governmental entities have "identified violations of the detention

15  standards at various detention facilities around the country." Id. ¶ 52.

16      "In most facilities that house immigration detainees DIHS does not have an on-site

17  presence.  At such facilities, medical care is provided either by a country jail, private

18  company that owns or operates the facility pursuant to an intergovernmental service

19  agreement with ICE, or for-profit company that specializes in correctional healthcare." Id.

20  ¶ 53.  However, even if DIHS does not have an on-site presence, it "must approve or deny

21  certain kinds of medical care pursuant to official DIHS policies . . . ." Id. ¶ 54.  Detainees

22  with chronic illnesses must "jump through a series of bureaucratic hoops designed to save

23  ICE money before they get treatment.  Specifically, detainees who require non-emergency

24  care for a chronic condition must get pre-authorization from DIHS before they may have

25  specialized care.  Detainees in detention have described waiting weeks or months for pre-

26  authorization for healthcare for chronic conditions. Id. ¶ 56.

27  //

28  //

3

1    **II.    Juan Carlos Baires**

2          Juan Carlos Baires was diagnosed with HIV in October of 2006. Id. ¶ 63. He was

3    arrested on September 18, 2008, for being an undocumented alien, and initially taken to

4    Santa Rita County Jail. Id. On September 19, 2008, "Dr. Maria Magat, M.D., at the Santa

5    Rita Jail examined BAIRES as part of a medical intake screening procedure. BAIRES

6    identified himself as HIV positive, and told Dr. Magat that he was currently taking HIV

7    medications." Id. ¶ 65. Beginning on September 24, Baires was given a daily administration

8    of three HIV medications. Id. ¶ 66. These administrations continued until October 20, 2008,

9    when Baires was transferred to the Lerdo Detention Facility. Id.

10         When Baires was transferred, his "Medical Information Transfer Form," given by the

11   Alameda County Sheriff's Office to the authorities at Lerdo, erroneously "indicated that

12   BAIRES took no medications" and "failed to list anything under 'medical/mental health

13   problems.'" Id.

14         Upon his arrival at Lerdo, Baires informed jail personnel that he was HIV positive and

15   that he regularly took HIV medications. Id. ¶ 68. The day after he arrived at Lerdo, Baires

16   was taken to see Dr. Khosrow Mostofi. Id. Baires informed Mostofi that he was HIV

17   positive. Id. Mostofi did not provide Baires with any HIV medication, but he did make an

18   appointment at the Immunology Clinic at the Kern Medical Center for November 10, 2008.

19   Id. ¶ 68. On October 24, 2008, Baires's immigration attorney called Agent Myrick

20   (presumably employed by ICE), and informed him that Baires had not been given his HIV

21   medication. Myrick "promised [the lawyer] that he would investigate the problem, and

22   would follow up to ensure that BAIRES did receive his medications."[2] Id. ¶ 69.

23         By this time, Baires had developed serious pain in his foot. Id. ¶ 70. Plaintiff called

24   home infrequently, appeared to drag his foot behind him when he walked, and "looked very

25   sick." Id. ¶ 72. Baires explained in letters that he was in great pain. Id. ¶¶ 73-74. On

26   November 5, 2008, Baires was seen in the Lerdo Infirmary, and Dr. Mostofi "diagnosed him

27

28
_____

          [2]    Myrick is not named as a defendant.

*United States District Court*
*For the Northern District of California*

with a superficial fungal infection." Id. ¶ 75. "MOSTOFI did not prescribe or provide the HIV medications BAIRES had been taking before he was taken into custody." Id.

Baires returned to the infirmary in the following days, continually complaining of pain in his foot and ankle. Id. ¶¶ 76-77. Baires's attorney again called Agent Myrick, who "once again promised to follow up on getting BAIRES proper medical treatment and his HIV medications. Again, no medications were provided." Id. ¶ 79.

Even though Plaintiff had an appointment with the Immunology Clinic for November 10, 2008, he was not taken to the Clinic. Instead, he "once again returned to the LERDO Jail Infirmary, complaining of increasingly severe pain in his left foot and ankle." Id. ¶ 81. "In the early morning of November 11, 2008, BAIRES reported chest pain, and was taken to KERN MEDICAL CENTER. He was admitted under the care of Irene Spinello, M.D. BAIRES immediately made it clear that he was HIV positive, and that he had not been given access to HIV medications for the past 23 days." Id. ¶ 82. The doctors intubated him, gave him a series of medications, and on November 12, the "General Surgeon ordered Orthopedist Kenneth Kaylor, M.D., to perform a fasciotomy (surgical incision of the fibrous covering of muscles." BAIRES was in critical condition at the time the fasciotomy was performed, and had a cardiac arrest shortly after the procedure began. BAIRES responded positively to resuscitation, and the procedure was completed." Id. ¶ 84-87. Nevertheless, Baires had further episodes of cardiorespiratory arrest in the intensive care unit, and was ultimately pronounced dead at 1:45pm on November 12.

**III.   Teofilo Miranda**

Miranda, who was also HIV positive, was taken into immigration custody on September 18, 2008. Id. ¶ 97. As did Baires, Miranda informed his jailers that he was HIV positive. Unlike Baires, however, Miranda apparently did not have a current prescription for HIV medication, as he had an appointment to obtain such a prescription scheduled for four days after his arrest. On September 22, 2008, Miranda was transferred to Santa Clara Jail in Santa Clara, California, as a federal immigration detainee. Id. ¶ 102. On or about September 30, 2008, doctors performed blood tests that reflected a low T-cell count. Id. ¶ 105. The

1  treating doctor made an appointment with an HIV specialist for on or around November 11,

2  2008.  Id.  The doctor also prescribed antibiotics, but Miranda did not receive anti-retroviral

3  therapy, "despite his repeated requests for the medication."  Id. ¶ 105.  While in Santa Clara,

4  Miranda "started noticing increasing physical symptoms that indicated his immune system

5  was weakening as a result of not receiving care."  Id. ¶ 106.

6          On November 6, five days before his scheduled HIV appointment, Miranda was

7  transferred to LERDO.  "MIRANDA's Federal Inmate Screening form documents that

8  MIRANDA immediately informed his overseers at LERDO that he was HIV positive and

9  that he had an appointment in a few days with an HIV specialist in Santa Clara.

10  MIRANDA's medical records from Santa Clara, including the critical results of his blood

11  work, did not accompany him to LERDO."  Id. ¶ 109.  Miranda soon met with Dr. Mostofi,

12  who declined to give Miranda any HIV medications "because [Miranda] had not brought any

13  with him from the last facility."  Id.  ¶ 110.  Mostofi instead prescribed a fungal cream used

14  to treat athlete's foot and instructed Miranda to use it on his face.  Id.

15          Miranda's case worsened, so he "sought assistance from ICE by submitting a request

16  to visit the immigration office in Bakersfield.  Detainees could request a visit to view their

17  personal belongings.  MIRANDA saw this as another way to inform ICE that he needed

18  medication.  The ICE officer he met with again said he would look into the issue, but again,

19  MIRANDA never heard back from the office or received any HIV medications or treatment."

20  Id. ¶ 117.

21          At a subsequent appointment with Dr. Mostofi, Mostofi informed Miranda that he

22  could not give Miranda HIV medication because he had not brought any with him from the

23  jail in Santa Clara, and asked Miranda to "sign an authorization form releasing his medical

24  records from Santa Clara."  Id. ¶ 120.  On or about November 25, Mostofi faxed Miranda's

25  medical release authorization to Santa Clara County.  "These records would have indicated

26  MIRANDA's dangerously low T-cell count.  By December 3, 2008, these records had still

27  not arrived at LERDO."  Id. ¶ 122.

28

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1  Miranda's condition continued to deteriorate, and he was eventually transported to the

2 Kern Medical Center.  Although the doctor there gave Miranda a new medication, he did not

3 perform any tests.  Miranda was given a form to fill out in order to authorize the blood tests,

4 but was later told that he had the wrong form.  No tests were ever conducted at the Kern

5 Medical Center.  Instead, a few days later Miranda was again taken to the ICE office, this

6 time to be examined by a United States Army Doctor.[3]  After Miranda informed the doctor of

7 his condition and the way he had been treated, "[t]he doctor was visibly upset, and told

8 MIRANDA that he could not understand why MIRANDA still hadn't received any HIV

9 medication or why he had been transferred from Santa Clara to Bakersfield just before his

10 appointment with the HIV specialist.  After their conversation, the doctor told MIRANDA

11 that he was going to make a couple of phone calls to try to help."  Id. ¶ 131.

12  Apparently the same day, Miranda was released.  Id. ¶ 132.  "The next day, on

13 December 5, 2008, MIRANDA went to the hospital in San Francisco. . . .  Within ten days,

14 MIRANDA was back on a regimen of anti-retroviral medication, which he continues to

15 date."  Id.

16             **Legal Standard**

17  A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims

18 alleged in a complaint.  Ileto v. Glock, Inc., 349 F.3d 1191. 1199-2000 (9th Cir. 2003).

19 Under Federal Rule of Civil Procedure 8(2), a complaint must contain a "short and plain

20 statement of the claim showing that the pleader is entitled to relief."  "Detailed factual

21 allegations" are not required, but the Rule does call for sufficient factual matter, accepted as

22 true, to "state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 129 S. Ct.

23 1937. 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007)).

24 According to the Supreme Court, "a claim has facial plausibility when the plaintiff pleads

25 factual content that allows the court to draw the reasonable inference that the defendant is

26

27    [3] While the timing of this chronology is not precisely alleged in the FAC, it appears the visit
to the Army doctor was at most a few days after visiting Kern Medical Center.  The FAC alleges he was

28 first taken to Kern Medical Center in "late November or Early December."  FAC ¶ 124.  He was seen
by the Army doctor on December 4.

1  liable for the misconduct alleged." Id. at 1949-50.  In determining facial plausibility,

2  whether a complaint states a plausible claim is a "context-specific task that requires the

3  reviewing court to draw on its judicial experience and common sense." Id. at 1950.

4                                               **Analysis**

5  **I.  The Individual Federal Defendants**

6           The individual Federal Defendants ("the Individual Defendants")[4] move to dismiss the

7  claims against them on various grounds.  In the alternative, they move for summary

8  judgment.  Because this court concludes that the claims against them should be dismissed, it

9  does not reach the issue of whether summary judgment would be appropriate.

10          The Individual Defendants make four arguments in support of dismissal.  First, they

11  argue that this Court lacks personal jurisdiction over several of the defendants.  Second, they

12  argue that federal law precludes the claims alleged in the FAC as to three of the Individual

13  Defendants.  Third, they argue that they are entitled to qualified immunity.  Fourth, and

14  finally, they argue that plaintiffs have failed to allege sufficient facts under Iqbal from which

15  a claim may be stated.  This order reaches only the issues of personal jurisdiction and notice

16  pleading under Iqbal.  Although this Court concludes that it does have personal jurisdiction,

17  Plaintiffs have failed to allege facts supporting a claim against the individual federal

18  defendants.

19          **A.  Personal Jurisdiction**

20          Although sovereign immunity does not bar damages actions against federal officials in

21  their individual capacity for violations of an individual's constitutional rights, Plaintiffs still

22  must establish that the court has personal jurisdiction over the named official.[5]  See

23  Hutchinson v. United States, 677 F.2d 1322, 1327-28 (9th Cir. 1982).  The Individual

24  Defendants articulate the familiar three-part test for determining whether or not specific

25  personal jurisdiction may be exercised.  First, "[t]he nonresident defendant must do some act

26  _____

27          [4]  These Defendants include Janet Napolitano, John Torres, James T. Hayes, Nancy Alcantar, Jeffrey Sherman, Jose Rodriguez, and Timothy Shack, M.D.  Mot. at 1. .

28          [5]  Because Janet Napalitano is sued in her official capacity, Defendants do not challenge jurisdiction as to her.

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1   or consummate some transaction with the forum or perform some act by which he purposely

2   avails himself of the privilege of conducting activities in the forum, thereby invoking the

3   benefits and protections of its laws." Data Disc, Inc. v. Systems Tech. Assoc., Inc., 557 F.2d

4   1280, 1287 (9th Cir. 1977).  Second, "[t]he claim must be one which arises out of or results

5   from the defendant's forum-related activities." Id.  Third, the "[e]xercise of jurisdiction must

6   be reasonable." Id.

7       Defendants argue that for all defendants sued in their personal capacities—in other

8   words, all Individual Defendants save Janet Napolitano—Plaintiffs have failed to establish

9   personal jurisdiction pursuant to this test.  They are incorrect.  Plaintiffs have alleged that

10  these moving defendants were all involved in setting the nationwide policies that led directly

11  to the harm that forms the basis of the FAC. See FAC ¶¶ 23-28.  According to Plaintiffs,

12  these policies established a medical system that is incapable of providing adequate care to

13  immigration detainees.  While such a legal theory may fail on substantive grounds, it suffices

14  for purposes of personal jurisdiction.  The individuals are alleged to have crafted a policy

15  that shapes the behavior of an enormous governmental entity within the State of California.

16  This is more than sufficient for purposeful availment.  The FAC further alleges that the

17  claims arise out of these "forum-related activities."  Although the claims may be insufficient

18  under Rule 12(b)(6), they still allege that harm flowed from the implementation of the policy

19  within California.  Finally, given the national scope of these Defendants' behavior, and the

20  fact that the individuals were well aware of the nation-wide impact of these policies, there is

21  no reason to conclude that the exercise of jurisdiction would be unreasonable.

22      Defendants argue that there "is no authority" for the proposition that "any federal

23  official who sets policy for or is 'responsible for the administration' of a federal agency

24  should be subject to suit in any of the 50 United States." Opp. at 2.  But Plaintiffs do not rely

25  on such a broad proposition.  Instead, they argue that when federal official sets a policy that

26  governs the behavior of a federal agency (here, DHS and ICE) within a particular state (here,

27  California), and when that policy gives rise to a legal claim, it is constitutionally permissible

28  to subject that official to personal jurisdiction in that state.  This is nothing more than a

1  standard minimum contacts analysis.  Although Defendants seem to believe some different

2  test applies to government employees, they fail to cite any authority for such an exception.

3      **C. Iqbal**

4      The Individual Defendants argue that the allegations against them are "conclusory

5  without any support."  Mot. at 8.  They note that although Plaintiffs allege that the individual

6  "defendants had knowledge of Baires [sic] and Miranda's medical situation," the FAC

7  acknowledges elsewhere "that the federal government has no day-to-day operational

8  oversight of the county facilities where the detainees were held."  Id.  They further argue that

9  Plaintiffs' FAC "fails to list any deficient policies or procedures, much less how any of the

10  *Bivens* defendants knowingly violated the Constitution in failing to adopt policies."  Id.  In

11  sum, the Individual Defendants argue that there are no factual allegations relating to how

12  their individual actions caused harm to Plaintiffs.  Because there is no vicarious liability

13  under Bivens, see Pellegrino v. United States, 73 F.3d 934 (9th Cir. 1996), Plaintiffs must

14  allege that the named defendants caused constitutional harm.

15      Plaintiffs disagree.  First, they contend that the individual defendants did indeed have

16  knowledge of the Plaintiffs' medical conditions, and that this particularized knowledge gave

17  rise to a duty to correct constitutional harms under the Eighth and Fourteenth Amendments.

18  In fact, they argue that the Government's suggestion to the contrary "is both incorrect and

19  illogical."  Opp. at 9.  Although Plaintiffs do not explain how such a statement is illogical,

20  they do contend that "the agencies charged with the treatment, care, and housing of ICE

21  detainees would be privy to information about these detainees through systematic and official

22  channels of information."  Id.  Moreover, Plaintiffs explain, press coverage of the treatment

23  of immigrant detainees was sufficiently widespread to make the Individual Defendants aware

24  of the conditions faced by detainees.

25      Plaintiffs believe this is sufficient to show the Individual Defendants' knowledge of

26  Plaintiffs' mistreatment, which therefore might give rise to a duty to remedy the

27  mistreatment.  This is incorrect.  As the FAC so ably chronicles, the relevant federal agencies

28  are enormous operations.  The fact that ICE keeps track of the status of all detainees cannot

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  mean that the directors of various agencies are aware, at all times, of the status of each and

2  every detainee.  Such an argument is entirely implausible.  Similarly, the fact the press

3  attention revealed certain mistreatment within the system does not mean that Defendants

4  were aware that these individual detainees were being mistreated.  Furthermore, as explained

5  more thoroughly below, the press treatment alleged concerns governmental policies that are

6  not alleged to have caused the harm suffered by Plaintiffs.  This is not a class action, and it is

7  not sufficient to allege that there existed a group experiencing mistreatment.  Even if this

8  were a class action, the FAC must allege that these Plaintiffs were harmed by these

9  Defendants.  Therefore, because there is no factual allegation that the Individual Defendants

10  knew of Plaintiffs' conditions, their simple failure to correct those conditions is not sufficient

11  to state a claim for relief.

12      Plaintiffs offer an alternative theory of Bivens liability, based upon the policies

13  established by the Individual Defendants.  They explain that even if the Individual

14  Defendants did not know specifically of Plaintiffs' suffering, they were the collective

15  architects of the policies that led to the mistreatment.  Opp. at 10.  Plaintiffs point to a

16  subsection of the FAC that outlines these policies, specifically, paragraphs 46 through 62.

17      This portion of the FAC begins by explaining that the policies require that detainees

18  with "HIV/AIDS must be treated in accordance with nationally recognized standards and

19  guidelines.  Each detainee who is diagnosed with a chronic-care issue must receive

20  appropriate and coordinated specialized care consistent with community standards."  FAC

21  ¶ 49.  However, the FAC goes on to allege that these policies are not followed.  Id.  The FAC

22  also alleges that other policies undermine the effective provision of medical care.  "Detainees

23  who need medical care for a chronic illness are forced to jump through a series of

24  bureaucratic hoops designed to save ICE money before they get treatment.  Specifically,

25  detainees who require non-emergency care for a chronic condition must get pre-authorization

26  from DIHS before they may have specialized care.  Detainees in detention have described

27  waiting weeks or months for pre-authorization for healthcare for chronic conditions."  Id. ¶

28  56.

11

1      In sum, Plaintiffs contend that these allegations support the conclusion that defendants

2   are liable because they "conscientiously implemented policies to 'ration' *essential* medical

3   care." Opp. at 8. However, the factual allegations relating to Plaintiffs' experiences do not

4   implicate these policies requiring pre-authorization, i.e. "rationing." Put another way, there

5   is no factual basis in the FAC to attribute the harm experienced by Plaintiffs to the policies

6   established by the Individual Defendants. On the contrary, as to both Plaintiff Baires and

7   Plaintiff Miranda, the harm is alleged to have been caused by the actions taken by individuals

8   in California, not policy-makers in Washington, D.C. The FAC alleges that both Plaintiffs

9   were seen by Dr. Mostofi and that for a variety of reasons, Dr. Mostofi failed to provide the

10  medications that Plaintiffs required. The FAC further alleges that Plaintiffs told a number of

11  people that they were HIV positive and needed medication, but that nobody helped them

12  obtain it. However, none of these people is a moving Individual Defendant. Moreover, none

13  of the harms alleged occurred because of a government policy.

14      Plaintiffs may have a different case if they had alleged that Dr. Mostofi attempted to

15  obtain the necessary medication but was unable to obtain timely pre-authorization from

16  DIHS. But that is not what is alleged. On the contrary, it appears simply that the treatment

17  Plaintiffs endured was in direct violation of other policies alleged in the FAC, such as the

18  policy providing that patients "with diseases such as HIV/AIDS must be treated in

19  accordance with nationally recognized standards and guidelines." FAC ¶ 49. Because the

20  alleged policy of medical rationing by DIHS is not connected to the treatment suffered by

21  Plaintiffs, the Individual Defendants' connection to that policy cannot make them liable for

22  the harm suffered by Plaintiffs. Therefore, the first, second, fifth, and sixth causes of action

23  are dismissed.

24      **C. Americans With Disabilities Act**

25      Plaintiffs also sue all defendants for violations of the Americans with Disabilities Act

26  ("ADA") and the Rehabilitation Act. FAC ¶¶ 206-218. The Individual Plaintiffs move to

27  dismiss this claim, but oddly enough, the brief on behalf of the United States does not

28

**United States District Court**
For the Northern District of California

1  mention it.  In total, the Individual Defendants' brief devotes two paragraphs to its discussion

2  of the ADA.**⁶**

3        For the same reasons explained above, the FAC's claim under the Rehabilitation Act

4  as to the Individual Defendants fails.  The allegations relating to the Individual Defendants'

5  role in creating nationwide policies has not been connected to the denial of services suffered

6  by plaintiffs.  Without such a connection, and for the same reasons explained above, the FAC

7  fails to sufficiently allege that the Individual Defendants themselves violated Plaintiffs'

8  rights under the Rehabilitation Act.  Therefore, the cause of action under the Rehabilitation

9  Act against the Individual Defendants is DISMISSED.

10  **II.  The United States**

11        The Government separately moves to dismiss the claims asserted against the United

12  States itself.  The FAC asserts twelve causes of action under the Federal Tort Claims Act.

13  The Government makes two arguments: (1) that Plaintiffs failed to exhaust their

14  administrative remedies, and (2) the torts alleged in this case were committed by independent

15  contractors, and the United States is therefore not responsible for them.

16        **A.  Administrative Remedies**

17        The FTCA provides that "a tort claim against the United States shall be forever barred

18  unless it is presented in writing to the appropriate Federal agency within two years after such

19  claim accrues . . . ."  28 U.S.C. § 2401(b).  In order for a federal district court to exercise

20  jurisdiction under the FTCA, a plaintiff must exhaust all administrative remedies before

21  filing suit.  Id. ¶ 2675(a).  The FTCA provides that the "failure of an agency to make a final

22  disposition of a claim within six months after it is filed shall, at the option of the claimant . . .

23  be deemed a denial of the claim."  Id.  When a plaintiff has prematurely initiated an FTCA

24  claim in a district court before exhausting her administrative remedies, the claim must be

25

26

27        ⁶  The Government refers to this claim as an ADA claim, but of course the ADA applies only
    to "public entities," which are defined in part as "any State of local government."  42 U.S.C.
28  § 12131(1)(A).  The FAC seeks relief on the same grounds under the Rehabilitation Act, which does
    indeed apply to executive agencies.  See 29 U.S.C. § 794(a).

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1    dismissed.  McNeil v. United States, 508 U.S. 106, 110 (1993).  The trouble in this case

2    concerns what it means to initiate an FTCA claim.

3          Plaintiffs filed their administrative complaints on June 30, 2009.  Plaintiffs filed their

4    original complaint on October 30, 2009--four months after initiating the administrative

5    process--but the original complaint did not include any claims under the FTCA.  Plaintiffs

6    filed their FAC, now including the FTCA claims, on May 4, 2010.  Plaintiffs argue that

7    because the FTCA claims were presented to this court more than six months after filing their

8    administrative complaints, this court has subject matter jurisdiction.  The Government,

9    however, argues that the claims asserted in the FAC, including those under the FTCA, date

10   back to the filing date of the original complaint.  Therefore, argues the Government, the

11   FTCA claims were effectively filed in October, and are therefore untimely.

12         There are cases on both sides of this question.  Plaintiffs note that a number of courts

13   have concluded that where an exhausted FTCA claim is asserted for the first time in an

14   amended complaint--as opposed to an unexhausted claim that is asserted in the original

15   complaint, and then reasserted in a post-exhaustion amended complaint[7]--that claim does not

16   relate back to the original filing date for purposes of exhaustion.  See, e.g., Wong v. Beebe,

17   No. 01-718, 2002 WL 31548486 (April 5, 2002), reversed in part on other grounds by Wong

18   v. United States, 373 F.3d 952 (9th Cir. 2004); Dupris v. McDonals, No. 08-8132, 2010 WL

19   231548, at *2 (D. Ariz. Jan. 13, 2010).  The Government, however, points to Lopez v.

20   Chertoff, No. 07-1566, 2009 WL 395220 (E.D. Cal. Feb. 17, 2009), and Boatwright v. Chipi,

21   No. 207-38, 2008 WL 819315 (S.D. Ga. March 26, 2008).

22         This Court follows Wong and Dupris and concludes that it has subject matter

23   jurisdiction.  Even the courts that have dismissed claims similar to those in this case have

24   noted that the plaintiffs would still be permitted to initiate an entirely new lawsuit.  Given

25   this fact, it is wastefully formalistic to conclude that Plaintiffs cannot introduce these new

26

27         [7] There seems to be more agreement as to this slightly different scenario: where a plaintiff files
     an untimely FTCA action and subsequently exhausts his administrative remedies, he cannot then amend
28   his complaint to cure the initial jurisdictional error.  See, e.g., Estate of Przysiecki v. Eifert, No. 07-39,
     2007 WL 3306074 (S.D. Cal. Nov. 2, 2007).

1   claims in an amendment.  There is no circuit level authority to guide this Court, but the plain

2   meaning of the statutory language also supports a finding of subject matter jurisdiction.

3   Section 2676 provides that an FTCA "action shall not be instituted . . . unless the claimant

4   shall have first presented the claim to the appropriate Federal Agency" (emphasis added).  In

5   this case, an FTCA action was not instituted until the FAC was filed.  While the Government

6   is correct that Rule 15 allows the FAC to relate back to the original complaint for purposes of

7   statutes of limitations, there is no reason to rely on Rule 15 to alter the plain meaning of the

8   statutory language.  Because the FTCA action was not instituted until the FAC was filed, and

9   because the FAC was filed more than six months after the administrative claim was made,

10  this Court concludes that it has subject matter jurisdiction.

11  **B.  Suits against independent contractors**

12        The Government next contends that the FAC seeks to hold the United States

13  Government liable for the actions of an independent contractor.  The law is clear that the

14  United States is not liable under the FTCA for torts committed by independent contractors.

15  See 28 U.S.C. § 2671 (specifically excluding contractors from the definition of "federal

16  agency"); Logue v. United States, 412 U.S. 521 (1973); Letnes v. United States, 820 F.2d

17  1517, 1518 (9th Cir. 1987).  However, where a third party acts as the agent of a Federal

18  Agency, the Government can be held liable under the FTCA.  Such an agency relationship

19  exists where the Government is able "to control the detailed physical performance of the

20  contractor" and supervise its "day-to-day operations."  Logue, 412 U.S. at 528.

21        The Government contends that Kern Country and the Lerdo Detention Facility, in

22  addition to the other non-federal defendants residing in Kern County (collectively, the "Kern

23  Entities"), are contractors as opposed to agents.  It contends that the Federal Government

24  does not have authority to control the detailed physical performance of these entities and

25  does not supervise their day-to-day operations.  In support of this conclusion, the

26  Government has submitted an excerpt from a Multi-Agency Detention Services contract

27

28

United States District Court
For the Northern District of California

15

United States District Court
For the Northern District of California

1    between Kern County and various federal entities, which the Government believes reflects

2    the fact that the Kern Entities were not agents of the federal government.[8]

3           Plaintiffs have two primary responses: (1) it is too early to determine whether the

4    Kern Entities are contractors or agents, and (2) even if the Kern Entities are not agents of the

5    federal government, the FAC also alleges torts committed by ICE, DHS, and DIHS officials.

6                    **i.  Status of the Kern Entities**

7           As for the issue of federal liability for the actions of the medical staff in Kern County

8    facilities**,** the government has the better of the argument.  First, the FAC itself alleges

9    "medical care is provided either by a country jail, private company that owns or operates the

10   facility pursuant to an intergovernmental service agreement with ICE, or for-profit company

11   that specializes in correctional healthcare."  FAC ¶ 54.  This suggests that the Federal

12   Government contracts with third parties to provide medical services, and does not indicate

13   that the Federal Government exercises any kind of direct supervision or day-to-day

14   involvement.  The government has submitted a copy of the relevant intergovernmental

15   service agreement, which provides that the "Local Government is financially responsible for

16   all medical treatment provided to federal detainees within the facility.  The Local

17   Government shall provide the full range of medical care required within the facility including

18   dental care, mental health care, pharmaceuticals, and record keeping, as necessary to meet

19   the essential standards of the National Commission of Correctional Health Care's Standards

20   for Health Services of Jails."  Doc. 64, at 6.

21          The Government contends that this is sufficient to establish that the Kern County Jail,

22   the Lerdo Detention Facility, and the Kern County Medical Center were all operating as

23   independent contractors.  Plaintiffs argue that it is simply too early in the litigation to

24   conclude that these entities were independent contractors, and that they are entitled to

25   discovery in order to further illuminate the question.  They further explain that in order to

26   properly determine whether an entity is a contractor or an agent, one must consider the

27

28          [8]  Because the Agreement is referenced in the FAC, and Plaintiffs do not dispute its authenticity, it is properly considered in a motion to dismiss.  See United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003).

**United States District Court**
For the Northern District of California

1   totality of circumstances rather than "merely the plain language of contractual agreements."

2   This may be true, but this cannot mean discovery is available in every case where the

3   agent/contractor question arises.  Plaintiffs still bear the burden to allege facts that, if true,

4   give rise to liability.  At present, the facts alleged in the FAC, coupled with the Agreement

5   provided by the Government, all support the conclusion that the Kern County entities

6   operated as independent contractors.  There is no allegation of day-to-day supervision on

7   detailed oversight of detention operations.  The fact that the Government imposed certain

8   conditions in the Agreement does not transform the Kern Entities from contractors into

9   agents.  See United States v. Orleans, 425 U.S. 807, 816 (1976) (explaining that "by contract,

10  the Government may fix specific and precise conditions to implement federal objectives"

11  without "convert[ing] the acts of . . . state governmental bodies into federal governmental

12  acts"); see also Letnes v. United States, 820 F.2d 1517, 1519 (9th Cir. 1987) ("[D]etailed

13  regulations and inspections are no longer evidence of an employee relationship.  There must

14  be substantial supervision over the day-to-day operations of the contractor in order to find

15  that the individual was acting as a government employee.").

16      Plaintiffs' citations to various cases only serve to strengthen the Government's

17  arguments.  For example, Plaintiffs cite to Bird v. United States, 949 F.2d 1079, 1086 (10th

18  Cir. 1991), in which the Court held that a nurse at an Indian hospital was a federal employee.

19  The Court noted that the nurse was required to work with patients designated by others,

20  maintained no separate office, could see patients in no other place or under any other

21  circumstances than directed by government employees, and was under the supervision of the

22  government at the hospital to the same extent that a regular employee of the government was.

23  First, in Bird the hospital itself was a governmental entity, and the question was whether a

24  particular nurse functioned as a contractor or an employee.  Such a scenario is only

25  minimally relevant to this one.  Second, to the extent the factors listed are relevant here, they

26  suggest that the Kern Entities functioned as independent contractors.  Although they housed

27  and cared for federal detainees, they presumably housed a number of non-federal persons.

28  Moreover, while the Agreement contained contractual obligations, the Kern Entities are not

17

**United States District Court**
For the Northern District of California

1    alleged to have been directed by government employees, nor was there a government

2    overseer.

3           While Plaintiffs are correct that this Court should "look to the totality of

4    circumstances to determine an individual's employment status," Opp. at 20, and not rely

5    solely on contractual agreements, the totality of circumstances in this case suggests that the

6    Kern Entities are independent contractors.  It is simply implausible to conclude that the Kern

7    Entities, by virtue of the fact that they agreed to take custody of federal detainees pursuant to

8    contract, became in effect federal actors.  Furthermore, the FAC's conclusory allegation that

9    various individuals were in fact "agents" of the federal government is not entitled to the

10   presumption of truth without any factual allegations supporting it.  Therefore, the FTCA

11   claims must be DISMISSED.

12                  **ii.  FTCA claims based upon actions of federal employees**

13          Plaintiffs argue that regardless of whether the Kern Entities are independent

14   contractors, the FAC independently asserts FTCA claims based upon the actions of certain

15   employees of ICE and DHS.  Specifically, the FAC alleges that Baires's immigration

16   attorney twice called Agent Myrick to inquire about Baires's HIV medication.  FAC ¶¶ 69,

17   79.  Myrick promised to look into the matter, but there are no allegations as to what precisely

18   he did.  As for Miranda, the FAC alleges that he informed an ICE official upon his arrest that

19   he was HIV positive and needed to attend a doctor's appointment in order to obtain

20   medication.  It further alleges that Miranda once asked a visiting ICE officer why he was not

21   receiving adequate medication.  Id. ¶ 116.  Miranda also visited the ICE office in Bakersfield

22   and informed an officer that he was not receiving treatment.  Id. ¶ 117.  Both officers

23   responded that they would look into it, but Miranda never received any followup

24   communication.

25          In sum, the FAC contains allegations regarding four different ICE officers ("the

26   Officers"), and Plaintiffs now seek to premise their FTCA claims on these allegations.  All

27   four Officers are alleged to have been informed by one of the Plaintiffs, or one of the

28   Plaintiffs' representatives, that they were not receiving the medical care they required.  The

**United States District Court**
For the Northern District of California

1   FAC further alleges that these Officers did not correct the problem.  However, the FAC does

2   not allege any facts regarding specifically what these Officers did or did not do.  It alleges

3   merely that the agents were informed of the problems, and did not fix them.

4        The case cited by Plaintiffs that most resembles this case is <u>Cesar v. Achim</u>, No.

5   07C128, 2009 WL 2225414 (E.D. Wis. July 22, 2009).  The plaintiff in <u>Cesar</u> alleged that he

6   had been denied medical care while in the custody of an independent contractor, and the

7   court explained that although the United States was not liable under the FTCA for the

8   tortious actions of the contractor, the complaint had made specific allegations concerning the

9   actions and inactions of federal employees.  First, the complaint specifically alleged that the

10  federal employees had done nothing to remedy the lack of medical care despite being put on

11  notice of it.  Second, the complaint in <u>Cesar</u> alleged that ICE officers "confiscated some of

12  plaintiff's medication and did not return it to him."  <u>Id.</u> at *2.

13       This case is easily distinguishable from <u>Cesar</u>.  Here the FAC does not allege any

14  facts regarding what the Officers did or did not do.  The Officers could have exercised

15  reasonable care and simply failed to correct the problem.  The FAC does not say otherwise.

16  Although the <u>Cesar</u> opinion does not specify, it suggests that the complaint in that case was

17  more specific in terms of alleging total inaction on the part of the ICE officers.  More

18  importantly, <u>Cesar</u> notes that the complaint also alleged that ICE officers confiscated

19  plaintiff's medication and did not return it to him.  This specific factual allegation clearly tied

20  the federal employees to the harm suffered by the plaintiff.  No such allegation has been

21  made in this case.  Although the Officers were informed by Plaintiffs that they were not

22  receiving their medicine, there is no allegation that the Officers did anything to directly

23  contribute to the situation.  The FAC even fails to directly allege that the Officers did not

24  take reasonable actions in light of being told that Plaintiffs were not receiving their

25  medication.  Instead, the FAC relies on the fact that the Officers were informed of the

26  situation, but failed to correct it.

27       It is hard to believe how these allegations alone, if proved, would entitle Plaintiffs to

28  relief under the FTCA.  The FAC is devoid of allegations as to what the unknown ICE

United States District Court
For the Northern District of California

1   Officers did or did not do.  It is clear, however, that these Officers were not regular custodial

2   staff who could be expected to exercise direct control over the conditions of confinement

3   (even putting aside the agent/contractor issue).  It is therefore hard to infer from their failure

4   to correct the problems that they also failed "to take reasonable action to summon such

5   medical care."  It also bears noting that these Officers were not medical personnel, and it is

6   unclear what they could have done to alter Plaintiffs' treatment.  Plaintiffs were being seen

7   by a physician, and the fact that the physician is alleged to have been dangerously careless

8   and incompetent does not necessarily vest an individual ICE officer with the discretion to

9   change doctors, change medications, or otherwise alter Plaintiffs' treatment.

10          As currently drafted, the FAC fails adequately to allege an FTCA cause of action

11  based upon the actions of the unknown ICE agents.  Therefore, the claims are DISMISSED

12  without prejudice.

13                                              **Conclusion**

14          Despite the horrifying allegations in the FAC, as currently pleaded it fails to state a

15  claim against the moving defendants.  The individual defendants--policy-makers in

16  Washington, D.C.--never interacted with Plaintiffs.  And while they are alleged to have

17  enacted unconstitutional policies, the only policies articulated in the FAC are not alleged to

18  have harmed Plaintiffs.  On the contrary, the FAC alleges that Plaintiffs were harmed by poor

19  health care provided by non-federal actors.  Because the FAC further suggests that these

20  actors were independent contractors, the United States is not liable for their allegedly tortious

21  conduct under the FTCA.  Plaintiffs' attempt to rest their FTCA claims on the conduct of

22  four ICE Officers, despite their failure to allege with any factual support what they did or did

23  not do in an attempt to aid Plaintiffs, does not prevail.

24          The motions are therefore GRANTED without prejudice.

25          **IT IS SO ORDERED.**

26

27  Dated: September 7, 2010                    _____
                                               CHARLES  R.  BREYER
28                                             UNITED STATES DISTRICT JUDGE