James M. Wood (SBN 58679)
Jayne E. Fleming (SBN 209026)
Amy Lifson-Leu (SBN 260062)
Katie B. Annand (SBN 260343)
REED SMITH LLP
101 Second Street, Suite 1800
San Francisco, CA  94105-3659
Telephone:     +1 415 543 8700
Facsimile:     +1 415 391 8269

Attorneys for DORA BAIRES, individually, and
on behalf the estate of JUAN CARLOS
BAIRES; and Teofilo MIRANDA, an
individual.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DORA BAIRES, et al., | No.:  C 09-05171 CRB |
| Plaintiffs, | **PLAINTIFFS DORA BAIRES AND TEOFILO MIRANDA'S OPPOSITION TO UNITED STATES' AMENDED MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT** |
| vs. | |
| THE UNITED STATES OF AMERICA; et al., | |
| Defendants. | |
| | Complaint Filed:     October 30, 2009 |
| | Date:      March 11, 2011 |
| | Time:      10:00 am |
| | Place:      Hon. Charles R. Breyer |
| | Courtroom 8 |

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

### TABLE OF CONTENTS

1

**Page**

I.    INTRODUCTION ................................................................................................1

II.   FACTUAL BACKGROUND ...............................................................................3

III.  LEGAL ANALYSIS.............................................................................................5

      A.    Governing Standards.................................................................................5

      B.    Plaintiffs Exhausted Their Administrative Remedies.................................5

      C.    Defendants Have Not Met Their Burden Of Proving The Independent
            Contractor Or Discretionary Function Exceptions Shield It From Liability ......6

            1.    The Independent Contractor Exception Does Not Apply ................7

                  a.    The Government Cannot Contract Away Its Duty To Provide
                        Reasonable Medical Care To Immigration Detainees .....................7

                  b.    Government Employees Engaged In Wrongful Conduct That
                        Falls Outside The Scope Of The Independent Contractor
                        Defense .........................................................................................9

            2.    The Discretionary Function Exception Does Not Apply ...............13

                  a.    The Government Has No Discretion To Disregard Its
                        Constitutional Duty To Provide Medical Care To Immigration
                        Detainees In Its Custody ..............................................................13

                  b.    DHS And ICE Employees Have A Mandatory Obligation To
                        Comply With Their Own Policies.................................................14

                  c.    Failed Monitoring Of Wayward Jails That Recklessly
                        Disregard National Detention Standards Cannot Be Justified
                        On Policy Grounds.......................................................................16

                  d.    Plaintiffs Are Entitled To Discovery To Develop Facts
                        Relevant To The Discretionary Function Exception ....................17

      D.    Plaintiffs Have Stated Claims Of Intentional Infliction Of Emotional Distress..........20

      E.    The Court Has Jurisdiction Over Plaintiffs Claims For Injunctive Relief.................20

IV.   Conclusion ........................................................................................................21

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

- i -

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007)..................................................................................5

*Bell v. Hood,*
  327 U.S. 678 (1945).............................................................................20, 21

*Berkovitz v. United States,*
  486 U.S. 531 (1988).............................................................................13, 14

*Butcher's Union Local No. 498 v. SDS Inv. Inc.,*
  788 F.2d 535 (9th Cir. 1986)....................................................................18

*Church of Scientology of California v. Flynn,*
  744 F.2d 694 (9th Cir. 1984)......................................................................5

*Clegg v. Cult Awareness Network,*
  18 F.3d 752 (9th Cir. 1994)........................................................................5

*Cross v. bonded Adjustment Bureau,*
  48 Cal. App. 4th 266 (1996)......................................................................20

*Davidson v. City of Westminster,*
  32 Cal. 3d 197 (1982)...............................................................................20

*DeShaney v. Winnebego County Dept. of Social Svcs.,*
  489 U.S. 189 (1989)....................................................................................7

*Dupris v. McDonalds,*
  No. 08-8132, 2010 WL. 231548 (D. Ariz. Jan. 13, 2010)........................6

*Estelle v. Gamble,*
  429 U.S. 97 (1976)......................................................................................7

*Laub v. United States Dept. of the Interior,*
  342 F.3d 1080 (9th Cir. 2003)..................................................................18

*Leach v. Shelby County Sheriff,*
  891 F.2d 1241 (6th Cir. 1990)....................................................................8

*Limone v. United States,*
  579 F.3d 79 (1st Cir. 2009)......................................................................14

*Logue v. United States,*
  412 U.S. 521 (9173)....................................................................................7

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992)....................................................................................5

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

- i -

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Marlys Bear Medicine v. United States,*
     241 F.3d 1208 (9th Cir. 2001) ...................................................................13

*Medina v. United States,*
     259 F.3d 220 (4th Cir. 2001) .....................................................................14

*Myers v. Myers, Inc. v. United States Postal Serv.,*
     527 F.2d 1252 (2d Cir. 1975) ....................................................................14

*NOW, Inc. v. Schindler,*
     510 U.S. 249 (1994)......................................................................................5

*Neighbarger v. Irwin Industries, Inc.,*
     8 Cal. 4th 532 (1994) ...................................................................................9

*Nurse v. United States,*
     226 F.3d 996 (9th Cir. 2000) .....................................................................13

*Papa v. United States,*
     281 F.3d 1004 (8th Cir. 2002) ...................................................................15

*Parks School of Business, Inc. v. Symington,*
     51 F.3d 1480 (9th Cir. 1995) .......................................................................5

*Penilla v. City of  Huntington Park,*
     115 F.3d 707 (9th Cir. 1997) ...............................................................15, 16

*Phillips v. United States,*
     956 F.2d 1071 (11th Cir. 1992) .................................................................16

*Pollard v. GEO Group, Inc.,*
     607 F.3d 583 (9th Cir. 2010) ..................................................................8, 9

*Prisco v. Talty,*
     993 F.2d 21 (3d Cir. 1993) ........................................................................14

*Raz v. United States,*
     343 F.3d 945 (8th Cir. 2003) .....................................................................14

*Rhodes v. Avon Products,*
     504 F.3d 1151 (9th Cir. 2007) ...................................................................19

*Rosas v. Brock,*
     826 F.2d 1004 (11th Cir. 1987) .................................................................14

*Schmoldt v. Wadco Industries, Inc.,*
     941 S. Supp. 905, 909 (D. Az. 1996) .........................................................17

*Sigman v. United States,*
     217 F.3d 785 (9th Cir. 2000) .....................................................................13

*Summers v. United States,*
     905 F.2d 1212 (9th Cir. 1990) ..............................................................16, 17

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Tekle v. United States,*
    511 F.3d 839 (9th Cir. 2007) ...........................................................................................20

*West v. Atkins,*
    487 U.S. 42 (1988)............................................................................................... passim

*Wong v. Beebe,*
    No. 01-718, 2002 WL. 31584846 (April 5, 2002) ...........................................................6

*Wong v. United States,*
    373 F. 3d 952 (9th Cir. 2004) ...........................................................................................6

### STATUTES

28 U.S.C. § 1331 .............................................................................................................20

28 U.S.C. § 1346(b) ..........................................................................................................6

28 U.S.C. § 2202 .............................................................................................................20

28 U.S.C. § 2243 .............................................................................................................20

28 U.S.C. § 2301 .............................................................................................................20

28 U.S.C. § 2680(a) ...................................................................................................12, 13

28 U.S.C. § 2680(h) .........................................................................................................20

Cal. Civ. Code § 1714(a) ...................................................................................................9

PLAINTIFFS DORA BAIRES AND TEOFILO MIRANDA'S OPPOSITION TO UNITED STATES' AMENDED
MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

# I.    INTRODUCTION

When the United States Government takes an immigration detainee into its custody, it is constitutionally obligated to provide that individual reasonable medical care during the period of detention.  That constitutional duty does not evaporate into thin air when the Government contracts for medical care with a non-federal entity.  Nor does the detainee's right to hold the Government accountable evaporate. As the United States Supreme Court made plain more than two decades ago, "contracting out prison medical care does not relieve the [United States] of its constitutional duty to provide adequate medical treatment to those in its custody." *West v. Atkins*, 487 U.S. 42, 56 (1988). If a contract physician misuses his power by ignoring a detainee's serious medical needs, "the resultant deprivation was caused by the [Government's] right to jail the detainee and to deny him a venue independent of the State to obtain needed medical care." *Id.*  Accordingly, the Government may be held liable for deficient care.

Here, the Department of Homeland Security ("DHS") detained Plaintiffs and banished them to a county jail with a long history of violating Immigration and Customs Enforcement ("ICE") National Detention Standards, despite knowing Plaintiffs were HIV positive and depended on reasonable access to medical care for their chronic conditions.  Plaintiff Juan Carlos Baires, represented in this action by his mother Dora Baires, died from medical neglect after enduring agonizing suffering in jail.  Plaintiff Teofilo Miranda endured 78 days of agonizing pain and suffering before the government ended his detention by simply dumping him on city streets in critical condition.

Plaintiffs filed this lawsuit for damages under the Federal Tort Claims Act ("FTCA"). Plaintiffs alleged the Government breached its duty to: (1) provide reasonable medical care; (2) monitor and control contract jails housing immigration detainees; and (3) take corrective action against the Lerdo jail where Plaintiffs were detained, despite knowledge of its sub-standard performance and history of negligent medical care. The Government now seeks to wash its hands of responsibility, claiming the "independent contractor" and "discretionary function" exceptions to the FTCA shield it from liability.

PLAINTIFFS DORA BAIRES AND TEOFILO MIRANDA'S OPPOSITION TO UNITED STATES' AMENDED
MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    This cannot be so under the Supreme Court's decision in *West*: the high court has made plain

2    that the Government has no discretion to contract away its constitutional duty to provide reasonable

3    medical care to detainees in its custody.  Furthermore, Government employees here engaged directly

4    in a series of wrongful acts that form an independent basis for liability.

5    *First*, DHS employees violated ICE National Detention Standards and policies by

6    transferring Plaintiffs among detention centers without taking steps to ensure continuity of their

7    medical care, including transfer of medical records and a continuous supply of HIV medications.

8    *Then*, DHS employees sent Plaintiffs to a jail hundreds of miles from their care providers, despite

9    knowing they were HIV positive, that this jail had been out of compliance with National Detention

10   Standards for years, and that it was notorious for ignoring detainees with urgent medical needs.

11   *Next*, DIHS employees stalled for weeks before authorizing consultations for off-site HIV care, and

12   failed to authorize HIV medications, despite knowing that even a brief interruption in those

13   medications may be life-threatening.  *Finally,* after Baires died, ICE dumped Miranda on the streets

14   of San Francisco in critical condition, without a care in the world for whether he lived or died.  This

15   Court should reject the Government's attempt to sweep this wrongful conduct under the rug. It

16   provides ample basis for liability.

17   The Court should likewise reject the Government's argument that it has unfettered discretion

18   to decide where to jail immigration detainees and who to contract with for bed space.  Such an

19   argument improperly narrows the issues.  The DHS has adopted and implemented National

20   Detention Standards and Policies that govern the conduct of its agents and employees.  Those

21   standards and policies cover subjects such as medical care, transfer of detainees, and inspection and

22   monitoring of jails for compliance with health and safety precautions.  DHS standards and policies

23   are not discretionary, they are mandatory.  When government employees ignore them, and detainees

24   suffer harm, the Government should be held accountable.

25   Finally, the Government argues that its determinations about where to jail immigration

26   detainees and how to provide for their care are "quintessentially policy-laden" decisions and there is

27   no room for scrutiny of those policy choices.  The Government's failure to take actions to correct

28

– 2 –

PLAINTIFFS DORA BAIRES AND TEOFILO MIRANDA'S OPPOSITION TO UNITED STATES' AMENDED
MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

flagrant deficiencies related to the provision of medical care at a wayward jail is not policy, but myopia.  The Government had repeatedly rated Lerdo as "at-risk" or "deficient" based on departures from National Detention Standards.  The Government had an opportunity to take a myriad of actions to protect Plaintiffs' safety and failed to do so.  Holding the Government liable for gross negligence leaves plenty of room for the Government to formulate policy.  It merely means that the policy choices must take into account that it will be liable if gross negligence injures those whom it takes into custody and deprives of the ability to protect themselves.  That is, of course, a proper allocation of responsibility between the individual and the enterprise and an allocation that will provide the right incentives for its policy choices.  If gross negligence in monitoring and oversight of Lerdo is regarded as policy, then the discretionary function exception would swallow the FTCA leaving it an emasculated statute that has no utility.  This was not the intent of Congress.

For all of these reasons, the Court should reject the Government's arguments and deny its Motion to Dismiss the Second Amended Complaint against the United States.

## II.    FACTUAL BACKGROUND

Plaintiffs have alleged that Juan Carlos Baires ("Baires"), a former asylum-seeker, received grossly inadequate and negligent medical care while under the care, custody and control of DHS, ICE, and DIHS, and their respective agents, servants, and/or employees.  (Second Amended Complaint and Demand for Jury Trial ("SAC") at ¶ 2)  As a direct and proximate result, he died on November 12, 2008.   Baires was HIV positive and at the time Defendant incarcerated him at Lerdo, he depended on life-saving antiretroviral medications to treat his chronic condition and fend off opportunistic infections.  (*Id.*)  Although Baires' lawyer pleaded with ICE to help him obtain his medications, those pleas fell on deaf ears.  As a consequence, Baires never received the HIV medications he needed to survive.  He developed an infection on his foot, which quickly flared into a medical emergency because of his compromised immune system.  (*Id.* ¶ 4)  He begged medical personnel and guards at Lerdo to treat him, to no avail.  The doctors and medical staff prescribed aspirin and anti-fungal cream rather than ordering blood tests or antibiotics.  (*Id.*) Baires' condition progressively worsened to the point that he could not walk and his infected foot eventually turned

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1   blue. Still, ICE detention officers, prison guards, and medical personnel turned a blind eye to his

2   suffering. (*Id.*)  After 54 agonizing and pain-filled days in custody, Baires was admitted to the

3   emergency room at Kern County Medical Center.  This was too late: Baires died the next day from

4   an undiagnosed and untreated staph infection that had traveled into his bloodstream. (*Id.*)

5          Plaintiffs have further alleged that Teofilo Miranda ("Miranda"), another asylum-seeker in

6   immigration detention, also received grossly inadequate and negligent medical care while under the

7   care, custody, and control of the DHS, ICE, Lerdo and their respective agents, servants, and/or

8   employees. (SAC ¶ 5)  The day ICE took Miranda into custody, he told the detention officers that he

9   was HIV positive and had an urgent upcoming medical appointment at San Francisco General

10  Hospital.  ICE employees disregarded his medical condition and locked him up in Santa Clara

11  County. (*Id.*)  Miranda told ICE officers and medical personnel in Santa Clara that he needed HIV

12  medication and treatment.  A jail doctor scheduled a visit to an immunology appointment.  Just days

13  before that appointment, ICE whisked Miranda off to Lerdo, hundreds of miles from the

14  appointment. (*Id.*)  As Miranda's physical condition spiraled downward, his fears for his life

15  escalated when he received news of Baires' death at Lerdo.  Miranda was terrified he too would be

16  abandoned until death. (*Id.*)  He pleaded with Lerdo medical personnel and ICE detention officers to

17  get him HIV medications.  Despite the fact that Baires had already died from lack of adequate

18  medical care, Lerdo and ICE personnel turned a blind eye to Miranda's condition. During Miranda's

19  entire 78-day incarceration, he never received HIV medications nor had a specialist examine his

20  chronic condition. (*Id.*) Upon his release from ICE custody, Miranda immediately went to San

21  Francisco General Hospital.  There, healthcare providers observed his severely deteriorated

22  condition and distressed emotional state and were outraged when they heard his story. (*Id.*)

23         Plaintiff alleged these are not isolated instances of medical neglect in jails housing asylum-

24  seekers and immigration detainees.  (FAC ¶ 6)  Rather, the inhumane neglect of Baires and Miranda

25  reflects systemic abuse that pervades the entire immigration detention system.  The consequences are

26  tragic.  More than one hundred individuals incarcerated in immigration facilities have died since

27  2003. (*Id.*)  Hundreds more have suffered agonizing pain with no relief, or been dumped from

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– 4 –

1   immigration facilities at death's door. (*Id*.)  Lerdo has the dubious distinction of being one of the

2   worst immigration detention facilities in the country.  According to ICE inspection reports, it has

3   been out of compliance with ICE National Detention Standards for years, consistently earning

4   ratings of "at risk" and "deficient" since 2007.  DHS and ICE officials knew this and took no

5   corrective or disciplinary action.  (*Id*.)  FOIA requests have turned up dozens of inmate grievances

6   based on inadequate medical care at Lerdo. (*Id*. ¶ 9)  These grievances reflect a horrifying pattern of

7   gross neglect on the part of personnel at Lerdo, and deficiencies on the part of DIHS, which DHS

8   and ICE knew about and had a duty to correct.  (*Id*. ¶¶ 9-10)

9                               **III.     LEGAL ANALYSIS**

10  **A.     Governing Standards**

11          To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted

12  as true, to "state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550

13  U.S. 544, 570 (2007).  A claim has facial plausibility when the allegations in the complaint contain

14  "enough fact to raise a reasonable expectation that discovery will reveal evidence of" the violations

15  alleged. *Id.* at 556.  A complaint's factual allegations, however, must be accepted as true.  *Church of*

16  *Scientology of California v. Flynn*, 744 F.2d 694, 696 (9th Cir. 1984).  The court must construe the

17  pleading in the light most favorable to plaintiff and resolve all doubts in plaintiffs' favor.  *Parks*

18  *School of Business, Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995) ("*Symington*").  Finally,

19  general allegations are presumed to include specific facts necessary to support the claim.  *NOW, Inc.*

20  *v. Schindler*, 510 U.S. 249, 256 (1994) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561

21  (1992)).  The court "is not required to accept legal conclusions cast in the form of factual allegations

22  if those conclusions cannot reasonably be drawn from the facts alleged."  *Clegg v. Cult Awareness*

23  *Network*, 18 F.3d 752, 754-55 (9th Cir. 1994).

24  **B.     Plaintiffs Exhausted Their Administrative Remedies**

25          The Government devotes six sentences on the last page of its brief to an argument that

26  plaintiffs have not exhausted their administrative remedies and thus this Court lacks subject matter

27  jurisdiction.  (U.S. Motion to Dismiss at 14) Specifically, the Government argues that plaintiffs

28

PLAINTIFFS DORA BAIRES AND TEOFILO MIRANDA'S OPPOSITION TO UNITED STATES' AMENDED
MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

1    prematurely filed their lawsuit before the time for consideration of their administrative claim to the

2    government had elapsed. (*Id*.)  This Court has already considered and rejected that argument.  (Order

3    on Motion to Dismiss at 8-9)  It should do so again.  Plaintiffs filed their administrative complaints

4    on June 26, 2009.  (SAC ¶ 18-19) Plaintiffs filed their original complaint on October 30, 2009—four

5    months after initiating the administrative process—but the original complaint did not include any

6    FTCA claims.  Plaintiffs filed their First Amended Complaint including FTCA claims on May 4,

7    2010.  Because the FTCA claims were presented to the Court more than six months after plaintiffs

8    filed their administrative complaints, the Court has subject matter jurisdiction. *See e.g., Wong v.*

9    *Beebe,* No. 01-718, 2002 WL 31584846 (April 5, 2002), reversed in part on other grounds by *Wong*

10   *v. United States*, 373 F. 3d 952 (9th Cir. 2004); *Dupris v. McDonalds*, No. 08-=8132, 2010 WL

11   231548 at *2 (D. Ariz. Jan. 13, 2010).

12   **C.    Defendants Have Not Met Their Burden Of Proving The Independent Contractor Or Discretionary Function Exceptions Shield It From Liability**

13         The FTCA imposes civil liability on the United States "for injury or loss of property, or

14   personal injury or death caused by the negligent or wrongful act or omission of any employee of the

15   Government while acting within the scope of his office or employment, under circumstances where

16   the United States, if a private person, would be liable to the claimant in accordance with the law of

17   the place where the act or omission occurred." 28 U.S.C. § 1346(b).  Plaintiffs have alleged claims

18   under the FTCA predicated on defendant's failure to: (1) provide them reasonable medical care and

19   ensure continuity of care when they were in ICE custody; (2) adequately screen and monitor Lerdo

20   for compliance with mandatory ICE Detention Standards; (3) authorize specialized HIV care and

21   medications in a timely manner; and (4) prevent foreseeable and life-threatening abuses at Lerdo,

22   including the denial of reasonable medical care.  (FAC ¶¶ 145-48, 243-57) The Government argues

23   that the "independent contractor" and "discretionary function" exceptions to the FTCA shield it from

24   liability.  (United States Amended Notice of Motion and Motion to Dismiss Plaintiffs' Second

25   Amended Complaint ("Mot") at 7-12)  This Court should reject those arguments.

26

27

28

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

– 6 –

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1     **1.     The Independent Contractor Exception Does Not Apply**

2          The Government fundamentally misapprehends the nature of Plaintiffs' claims when it

3     argues the independent contractor exception shields it from liability.  Plaintiffs do not seek to hold

4     Defendant liable for the negligent acts of its contractors.  Rather, they seek to establish Defendant's

5     liability for the wrongful acts of its own employees—the DHS and ICE agents charged with ensuring

6     the safety and well-being of Baires and Miranda. It is black letter law that the United States can still

7     be subject to FTCA liability if its own employees acted negligently. *See Logue v. United States*, 412

8     U.S. 521, 532 (9173) (United States can be liable for its own employees' negligent acts,

9     notwithstanding involvement of contractors).  As discussed next, Plaintiffs have alleged that

10    Defendant, though its own employees, engaged in a series of unconstitutional and tortious acts

11    against Plaintiffs.  These acts, not the acts of contractors, form the basis of Plaintiffs' claims.

12    **a.     The Government Cannot Contract Away Its Duty To Provide Reasonable Medical Care To Immigration Detainees**

13         Immigration detainees in federal custody must rely on the United States government to treat

14    their medical needs. *Estelle v. Gamble,* 429 U.S. 97, 103 (1976).  If the government fails to provide

15    treatment, those medical needs will not be met.  *See e.g., DeShaney v. Winnebego County Dept. of*

16    *Social Svcs.,* 489 U.S. 189, 199-200 (1989). In light of this, the United States has a duty under the

17    U.S. Constitution and California law to provide reasonable medical care to immigration detainees it

18    has taken into custody.  *Id.* (""[W]hen the State takes a person into its custody and holds him there

19    against his will," this Court has explained, "the Constitution imposes upon it a corresponding duty to

20    assume some responsibility for his safety and general well-being").  This "affirmative duty to protect

21    arises not from the State's knowledge of the individual's predicament or from its expressions of

22    intent to help him, but from the limitation which it has imposed on his freedom to act on his own

23    behalf." *DeShaney*, 489 U.S. at 200.

24         "Contracting out prison medical care does not relieve the [United States] of its constitutional

25    duty to provide adequate medical treatment to those in its custody."  *West v. Atkins*, 487 U.S. 42, 56

26    (1988).  As the Supreme Court made plain in *West,* if a contract physician misused his power by

27    demonstrating deliberate indifference to a detainee's serious medical needs, the resultant deprivation

28

– 7 –

was caused by the government's right to detain the alien and to deny him a venue independent of the state to obtain needed medical care.  *West*. 487 U.S. at 55; *see also Pollard v. GEO Group, Inc.,* 607 F. 3d 583, 590 (9th Cir. 2010) ("If [contract] employees demonstrated deliberate indifference to Pollard's serious medical needs, the resulting deprivation was caused, in the sense relevant for the federal-action inquiry, by the federal government's exercise of its power to punish Pollard by his incarceration and to deny him a venue independent of the federal government to obtain needed medical care").

*Leach v. Shelby County Sheriff*, 891 F. 2d 1241, 1251 (6th Cir. 1990), is instructive.  There, a paraplegic inmate filed suit against a county sheriff, alleging deliberate indifference to his serious medical needs.  *Id*. at 1250.  The sheriff argued that he should not be liable because medical care of prisoners at the jail was provided by private contractors, which was authorized by state law.  *Id*.  He further argued that the facts showed that only the contract medical personnel involved with caring for Leach caused his injuries through deliberate indifference and because these personnel were employed by a separate entity, the sheriff could not be liable for their actions.  *Id.* The court disagreed.  Discussing the Supreme Court's decision in *West*, it held that although the state and county had a right to contract out care, they retained ultimate responsibility for the prisoner's care. *Id*. at 1251. Because the sheriff was sued in his official capacity (thus it was effectively the state and county involved), the sheriff was not excused from liability due to having contracted out care.  Rather, Leach could potentially recover from the state.  *Id*.

The same analysis should apply here.  Although *West* and *Leach* did not involve a question of the applicability of the "independent contractor exception" in the FTCA context, the underlying reasoning in those cases is pertinent.  Immigration detainees with serious health conditions are entirely dependent upon the United States government to ensure they receive adequate medical care while they are in U.S. custody.  These civil detainees have no way to obtain care in alternative venues.  If a contract physician treating an immigration detainee shows deliberate indifference to the needs of that detainee and/or fails to provide him reasonable care, the cause of the deprivation traces

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    back to the United States because it retains ultimate responsibility for his care and has deprived him

2    of the opportunity to obtain care elsewhere.  *West*, 487 U.S. at 55: *Pollard*, 607 F. 3d at 590.

3          Defendant will no doubt argue that the FTCA involves tort duties under state law, not

4    constitutional duties under federal law, thus *West* and its progeny have no application.  The court

5    should reject that argument because the violation of a constitutional duty to provide medical care to

6    detainees may also form the basis of a common law negligence claim for purposes of the FTCA.  *See*

7    Cal. Civ. Code § 1714(a); *Neighbarger v. Irwin Industries, Inc.,* 8 Cal. 4th 532, 536 (1994) ("The

8    defendant owes a duty of care to all persons who are foreseeably endangered by his conduct, with

9    respect to all risks which make the conduct unreasonably dangerous").  Since the defendant cannot

10   contract away its duty as a matter of law, the independent contractor exception cannot shield it from

11   FTCA liability.

            **b.    Government Employees Engaged In Wrongful Conduct That Falls**
12          **Outside The Scope Of The Independent Contractor Defense**

13         The Government concedes that the independent contractor defense does not apply to

14   Plaintiffs' claims based on its negligent oversight of Lerdo after the jail received a string of "at risk"

15   and "deficient" inspection ratings.  The Government further concedes that the defense does not apply

16   to Plaintiffs' claims based on its failure to take corrective action after becoming aware of repeated

17   and on-going violations of ICE National Detention Standards, which Lerdo was required to adhere to

18   pursuant to the Intergovernmental Services Agreement ("IGSA") governing the operation of the jail.

19         Yet the Government is silent about other wrongful conduct forming the underpinning of

20   Plaintiffs' negligence claims against it, based on acts and omissions of ICE/DRO employees,

21   including multiple and repeated violations of National Detention Standards governing medical care.

22   The Standards require, among other things, that ICE/DRO employees and contract personnel provide

23   access to a continuum of health care services, including prevention, health education, diagnosis and

24   treatment; written information about how to access health care; timely follow-up to health care

25   requests; continuity of care from admission, to transfer, discharge, or removal, including referral to

26   community-based providers when indicated; care and treatment for chronic conditions; transfer of

27   medical records with detainees moved from one facility to another; and a 7-day supply of medication

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1   when a transfer takes place.  (SAC ¶¶ 55-59)  ICE/DRO employees violated every single one of

2   these standards in relation to Baires and Miranda.

3          For instance, Plaintiffs allege that defendants Alcantar and Aitken wrongfully transferred

4   Plaintiffs from Northern California detention facilities to Lerdo, which is hundreds of miles from

5   their families and care providers despite knowing: (1) they were HIV positive and had a life-

6   threatening medical condition; (2) Lerdo had a history of failing inspection ratings and was out of

7   compliance with National Detention Standards; and (3) dozens of immigration detainees at Lerdo

8   had filed medical grievances over the years. (FAC ¶¶ 30-31)  Given the jail's egregious track-record,

9   Alcantar and Aitken should never have transferred Plaintiffs there, especially without any follow-up

10  or monitoring, and it was a violation of National Detention Standards governing the medical needs

11  of detainees to do so.

12         Alcantar will no doubt claim that she had no knowledge that Baires and Miranda were HIV

13  positive before sending them to Lerdo.  If that is true, it is due to her negligent failure to review their

14  files before transferring them there.  Baires' file included a motion to reopen his case based on his

15  HIV status, which the immigration court had granted.  (SAC ¶80)  It is tragic irony that the motion

16  was predicated on an argument that he would not be able to obtain needed medical care in his

17  country of origin. Baires' file also included a letter from a physician at San Francisco General

18  Hospital warning that if his medications were interrupted this could have life-threatening

19  consequences. Alcantar could have reviewed Baires' file in all of five minutes or placed a call to

20  government counsel to ascertain the facts of his case.  Had she done so, she would have understood

21  he would face grave risks if she sent him to Lerdo, which had the dubious distinction of being one of

22  the lowest ranked detention sites in the country. (*Id*. ¶¶ 65-68)  To make matters worse, Baires was

23  transferred from Santa Clara County Jail—where he was receiving HIV medications and care—to

24  Lerdo with no medical records or supply of HIV medication, which violated ICE policies governing

25  the transfer of detainees with serious medical conditions.  (*Id*. ¶ 82)  Once he arrived there, Baires

26  told his jailors that he was HIV positive and needed medications.  (*Id*. ¶ 83)  They did nothing to

27  provide them.  Upon learning this, Baires' lawyer sent a fax to DRO agent Brian Myrick and

28

PLAINTIFFS DORA BAIRES AND TEOFILO MIRANDA'S OPPOSITION TO UNITED STATES' AMENDED
MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1   stressed the urgent nature of the situation, emphasizing that depriving Baires of HIV medications

2   posed life-threatening risks.  He did not respond to the fax for three days.  (*Id*. ¶ 85)  This flagrant

3   disregard for Baires' medical needs violated ICE National Detention Standards, which require that

4   HIV infected detainees receive continuous and reasonable medical care.

5           So, too, did the dangerous and unreasonable delays on the part of DIHS personnel charged

6   with pre-authorizing specialized medical care and non-routine prescriptions.  When Baires arrived at

7   Lerdo—without medical records or medications as required by ICE standards—he told medical

8   personnel he was HIV positive. (SAC ¶ 83)  They, in turn, transmitted the information to DIHS with

9   a request for authorization for specialized care.  (*Id*. ¶ 84)  Rather than act on the request in due

10  course, DIHS personnel waited 16 days before sending its approval for an HIV "consult only", not

11  HIV medications.  (*Id*. ¶ 95)  This restrictive authorization made no sense because Baires had

12  already been approved for HIV treatment at Santa Rita jail and what he needed was medications, not

13  a preliminary consult.  Had DIHS employees bothered to look at his medical records and history, this

14  would have been plain.  Assuming they did, the "consult only" order could only have resulted from a

15  desire to stall treatment for cost-saving purposes.  The 16-day delay in authorization, and failure to

16  authorize HIV medications, reflected either gross incompetence or deliberate indifference to Baires'

17  serious medical needs.  Any reasonable health care provider knows that a prolonged delay in HIV

18  treatment may put the patient's life at risk and DIHS nurses knew or should have known this was

19  true of Baires.  The failure to authorize medical care in a timely manner constitutes negligence on

20  the part of the Government.

21          The Government's treatment (or lack thereof) of Miranda was no less outrageous.  It would

22  have taken little effort for Alcantar to determine that Miranda was HIV positive.  When he was taken

23  into ICE custody he provided this information to the agents who detained him.  (SAC ¶ 109)  He

24  also told them he had an appointment at San Francisco General Hospital to receive treatment within

25  days. (*Id*. 112)  Pursuant to ICE National Detention Standards, the agents were charged with

26  relaying that information to their superiors, including Alcantar.  One of two scenarios must have

27  occurred: either the agents failed to relay the information, or they told Alcantar and other supervisors

28

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

about Miranda's medical condition and those supervisors disregarded the information. Both scenarios violate National Detention Standards, which require federal officials to take individual medical needs into consideration before detaining someone.  Instead of adhering to those standards, ICE ordered Miranda locked up so that he missed his scheduled medical appointment.  (SAC ¶ 113)  Miranda then told officials at the first detention center he was sent to that he was HIV positive.  After weeks of waiting, personnel there arranged for him to see a specialist.  (SAC 117)  Just days before that appointment, though, Alcantar ordered his transfer to Lerdo, causing him to miss yet a second appointment.  (*Id*. ¶ 117)  Again, no thought was given to Miranda's medical condition, his need for specialized care, his existing medical appointment, or the risks he would inevitably face at Lerdo, where he was sent without medical records or HIV medication.  Once Miranda arrived at Lerdo he told everyone—including ICE agents and officers—that that he needed HIV care and medications.  (*Id*. ¶ 117-18)  His pleas fell on deaf ears.  To make matters worse, DIHS dragged its feet on approving requests from medical personnel for specialized care.  Miranda suffered in detention for 78 days without receiving any HIV care.  (*Id*. ¶¶ 117, 134)  During this time period, Baires died from lack of care.  (*Id*. ¶ 120)  Although faxes about his death were flying between California and Washington DC within hours, the Government did nothing to investigate atrocious conditions at Lerdo or protect Miranda.  (*Id*.)  Instead, he endured more than three weeks of additional suffering and terror over whether he too would die in detention.  (*Id*. ¶¶ 132-34) By the time Miranda was released, he was in critical condition. Rather than ensuring his safety, ICE agents dumped him on the sidewalks of San Francisco without any regard for whether he would live or die.  (*Id*.) As the field officer in charge of detention determinations, Alcantar would have known about and condoned this outrageous conduct, which was a flagrant violation of the Constitution, California law and ICE National Detention Standards. For all of the above reasons, the court should reject the Government's argument that Plaintiffs' FTCA claim is subject to the independent contractor exception.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

PLAINTIFFS DORA BAIRES AND TEOFILO MIRANDA'S OPPOSITION TO UNITED STATES' AMENDED
MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

1

**2.      The Discretionary Function Exception Does Not Apply**

2     The FTCA expressly excludes any claim "based on the exercise or performance or the failure

3  to exercise or perform a discretionary function or duty on the part of a federal agency or an

4  employee of the Government, whether or not the discretion is abused." 28 U.S.C. § 2680(a).  Thus,

5  if the claim is based on a discretionary function, the United States remains immune from liability.

6  The burden of proving that the exception applies falls on the United States."  *Marlys Bear Medicine*

7  *v. United States*, 241 F. 3d 1208, 1213 (9th Cir.  2001) (burden of proof of the applicability of the

8  discretionary function exception is on the United States); *Sigman v. United States*, 217 F. 3d  785,

9  794 (9th Cir. 2000) (same).  To determine whether a claim is barred by the discretionary function

10  exception, courts apply the two-part test the Supreme Court set forth in *Berkovitz v. United States*,

11  486 U.S. 531, 536 (1988).  First, the conduct at issue must be discretionary, involving an element of

12  judgment or choice.  *Id*.  If the court determines that the act is discretionary, it "must determine

13  whether the judgment is of the kind that the discretionary function exception was designed to

14  shield."  *Id*.

15     Here, the Government argues "there is no directive to monitor, screen or stop using Lerdo as

16  an independent contractor" and decisions about the degree of monitoring required are "by their

17  nature discretionary." It further maintains that decisions about which jails to choose for detention

18  and how to monitor them are "quintessentially policy-laden" and the sorts of decisions that Congress

19  would "expect to be the subject of policy analysis."  This argument oversimplifies the discretionary

20  function analysis.

21     **a.      The Government Has No Discretion To Disregard Its Constitutional Duty
      To Provide Medical Care To Immigration Detainees In Its Custody**

22     Case law interpreting the discretionary function exception unequivocally denies the

23  Government its protection where the actions are unauthorized because they are unconstitutional,

24  proscribed by statute or exceed the scope of an official's authority.  *Nurse v. United States*, 226 F. 3d

25  996, 1002 (9th Cir. 2000) ("government conduct cannot be discretionary if it violates a legal

26  mandate).  Here, the Government violated the Constitution by disregarding its duty to provide

27  reasonable medical care to Plaintiffs.  Once the Government took Plaintiffs into its custody and

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– 13 –

denied them access to alternative venues for care, it assumed the obligation to either provide care directly or ensure that those it contracted with provided reasonable care.  Rather than living up to these obligations, the Government violated ICE standards related to medical care, deliberately delayed approval for HIV care, and turned a blind eye to a contractor that was notorious for ignoring detainee medical needs.  These acts and omissions were not discretionary.  They were unconstitutional. *West,* 487 U.S. at 56.  It is axiomatic that the Government has no discretion to violate the constitution. *Limone v. United States*, 579 F. 3d 79, 101 (1st Cir. 2009) ("It is elementary that the discretionary function exception does not … shield conduct that transgresses the Constitution); *see also Raz v. United States*, 343 F. 3d 945, 948 (8th Cir. 2003) (discretionary function exception does not apply to allegation that government violated plaintiff's constitutional rights because federal agents do not possess discretion to commit constitutional violations); *Medina v. United States*, 259 F. 3d  220, 225 (4th Cir. 2001) (noting that the starting point of  the discretionary function exception analysis is that "federal officials do not posses discretion to violate constitutional rights or federal statutes"); *Prisco v. Talty*, 993 F. 2d 21, 26 n.  14 (3d Cir. 1993) (discretionary function exception inapplicable to claim based on conduct that violated plaintiff's constitutional rights); *Rosas v. Brock*, 826 F. 2d 1004, 1008 (11th Cir. 1987) ("The law … is that adherence to constitutional guidelines is not discretionary; it is mandatory"); *Myers v. Myers, Inc. v. United States Postal Serv.*, 527 F. 2d 1252, 1261 (2d Cir. 1975) ("It is, of course, a tautology that a federal official cannot have discretion to behave unconstitutionally or outside the scope of his delegated authority").

   **b.     DHS And ICE Employees Have A Mandatory Obligation To Comply With Their Own Policies**

If a "federal statute, regulation or policy" specifically prescribes a course of action for the federal employee to follow, the employee has no choice but to adhere to the directive. *Berkowitz*, 486 U.S. at 536.  Thus, if a Government official violates a mandate, the shield of the discretionary function exception is removed.  *Id*.  The discretionary function exception should not apply to the Government's actions here because they were in conflict with the United States Constitution, California law and National Detention Standards.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

Of particular significance, DHS has adopted an explicit policy requiring on-going monitoring and inspection of all immigration detention facilities to ensure that detainees are not put at risk. DHS states on its website: "ICE, through an aggressive inspections program, ensures facilities utilized to detain aliens in immigration proceedings or awaiting removal to their countries do so in accordance with ICE National Detention Standards."[1]  Plaintiffs alleged in their complaint that defendant's employees failed to follow this policy and did nothing to ensure that Lerdo operated in accordance with National Detention Standards, despite on-going deficiencies.  (SAC ¶¶ 243-57)

Specifically, plaintiffs alleged: (1) DHS and ICE employees had a mandatory duty under the National Detention Standards to provide for on-site inspections of immigration detention facilities on an annual basis; (2) Hayes, Torres, Alcantar and Aitken knew or should have known that inspectors had given Lerdo failing ratings for 2004, 2006 and 2008 because they all received annual inspection reports on the facility; (3) Alcantar and Aitken had direct oversight responsibilities for Lerdo and thus knew or should have known about the pattern of medical neglect at Lerdo; (4) Hayes, Torres, Alcantar and Aitken acted in violation of National Detention Standards when they failed to take corrective action to ensure that Lerdo cured known deficiencies and provided reasonable and adequate medical care to immigration detainees at the jail; (5) Alcantar knew or should have known that Baires and Miranda were HIV positive and thus had a life threatening  medical condition because they were both asylum seekers under her supervision and their asylum claims were based on their HIV status; (6) despite knowing of their serious medical needs, and the pattern of egregious medical neglect at Lerdo, Alcantar transferred Baires and Miranda to Lerdo and then did nothing to ensure their safety and well-being; and (7) despite knowing of a history of non-compliance with National Detention Standards and track-record of egregious safety and medical concerns, DHS authorized renewal of the IGSA with Lerdo without requiring it to correct on-going violations of safety standards.  (SAC ¶¶ 28-31)

The Government's failure to fulfill its oversight obligations, and its affirmative actions of transferring Baires and Miranda to a hazardous facility, were not discretionary, but in direct

_____

[1] Available at: www.nicic.org/pubs/2003/period235.pdf

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    contravention of governing DHS policy and the law.  *See Papa v. United States*, 281 F. 3d 1004,

2    1010 (8th Cir. 2002) ("Officials may not … consciously disregard or act with deliberate indifference

3    toward a detainee's safety by knowingly placing that person in harm's way"); *Penilla v. City of*

4    *Huntington Park*, 115 F. 3d 707, 709 (9th Cir. 1997) ("when a state officer's conduct places a person

5    in peril in deliberate indifference to their safety, that conduct creates a constitutional claim").

6        In taking the above actions, the Government knowingly placed Baires and Miranda in harm's

7    way by disregarding the serious risks to their health and life and violating ICE policies designed to

8    ensure that detainees receive reasonable medical care.  Those actions were not discretionary.  They

9    constituted negligence.  Accordingly, the government is not immune from suit under the FTCA.  *See*

10   *Summers v. United States*, 905 F. 2d 1212, 1215 (9th Cir. 1990) (government's authorization of

11   contract was discretionary, but failure to monitor and ensure safety at work site was not); *see also*

12   *Phillips v. United States*, 956 F. 2d 1071, 1076 (11th Cir. 1992) (not a discretionary function in

13   failing to perform mandatory safety obligations).

        **c.    Failed Monitoring Of Wayward Jails That Recklessly Disregard National
               Detention Standards Cannot Be Justified On Policy Grounds**

16       The Government maintains that its determinations regarding where to house immigration

17   detainees and decisions regarding the monitoring and control of such facilities are matters of

18   judgment and choice grounded in consideration of policy and thus protected activity.  That may be

19   so, but that is not what is at issue here.  The issue here is not whether the Government was

20   authorized to enter into an IGSA with Lerdo.  It is whether the Government violated its own policies

21   regarding delivery of medical care to HIV positive detainees and monitoring of jails it contracted

22   with to ensure compliance with National Detention Standards.

23       With respect to acts and omissions on the part of federal actors directed at Plaintiffs, no

24   policy justification was given for why DHS and ICE agents transferred Baires to Lerdo without his

25   medical records or an adequate supply of HIV medication.  No policy justification was given for

26   why DIHS officials waited 16 days before authorizing an HIV consult for him, despite his known

27   medical condition. No policy justification was given for why DIHS officials never authorized HIV

28

1   medications for Baires, despite knowing he was HIV positive. No policy justification was given for

2   why Agent Myrick waited 3 days before relaying urgent medical information about Baires from his

3   lawyer to medical personnel at Lerdo.  No policy justification was given for why DHS and ICE

4   agents transferred Miranda to Lerdo despite knowing of his life-threatening medical condition and

5   the history of sub-standard medical care there.  No policy justification was given for why DHS and

6   ICE dumped Miranda on the streets of San Francisco after 78 days in detention without medical

7   care, with no regard for his life.

8           As for the Government's failure to address on-going violations of National Detention

9   Standards at Lerdo, the decision not to take affirmative steps to correct dangerous conditions for

10  immigration detainees is not susceptible to a policy analysis. A failure to cure deficiencies in

11  medical care involves considerations of health and safety, not public policy.  Thus, it would be

12  wrong to apply the discretionary function exception in a case where the Government made a

13  judgment not to require correction of deficiencies that put detainee lives at risk.  To interpret such a

14  judgment as discretionary would be too expansive an interpretation of Congress' intent in creating

15  the discretionary function exception.  *See e.g., Summers*, 905 F. 2d at 1215-16 (decision not to warn

16  of a specific known hazard "is not the kind of broader social, economic or political policy decision

17  that the discretionary function exception is intended to protect"); *Schmoldt v. Wadco Industries, Inc.,*

18  941 S. Supp. 905, 909 (D. Az. 1996) (decision not to take affirmative steps to correct safety

19  violations was not policy decision protected under discretionary function exception).  For all of these

20  reasons, the Court should reject the Government's argument that the discretionary function

21  exception shields it from liability.

22          **d.    Plaintiffs Are Entitled To Discovery To Develop Facts Relevant To The
                    Discretionary Function Exception**

23

24          The Government has filed the Declaration of Defendant Nancy Alcantar with its motion to

25  dismiss the Second Amended Complaint.  Alcantar states in her declaration that Lerdo was in

26  compliance with National Detention Standards and that DHS/ICE has broad discretion to determine

27  where to jail detainees and those determinations are guided by multiple policy-laden factors.  The

28

– 17 –

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1   Court should disregard this declaration.  To begin with, it does not state facts, but rather draws

2   unsubstantiated conclusions.  How, for instance, can Alcantar possibly state that Lerdo was in

3   compliance with National Detention Standards when it had flunked three inspections running and

4   those failing grades were predicated on non-compliance with National Detention Standards? The

5   Government itself has reported Lerdo received "at risk" and "deficient" ratings in public documents

6   created by DHS.[2]  Ignoring those reports won't make them go away.  Nor will Alcantar's self-

7   serving declaration change the fact that DHS/ICE abdicated its responsibility to correct deficiencies

8   at Lerdo.  Thus, while she may be right that the Detention and Removal Office has wide discretion to

9   determine where to jail detainees, that discretion does not extend so far as to allow it to send

10  detainees to places it knows are hazardous.

11      Insofar as Alcantar's declaration draws nothing more than bald conclusions, it merely

12  underscores that discovery is needed to develop additional facts relevant to the discretionary

13  function exception.  Case law is clear that "discovery should ordinarily be granted where pertinent

14  facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing

15  of the facts is necessary."  *Laub v. United States Dept. of the Interior*, 342 F. 3d 1080, 1093 (9th Cir.

16  2003) (quoting *Butcher's Union Local No. 498 v. SDS Inv. Inc.,* 788 F. 2d 535, 540 (9th Cir. 1986)).

17  Here, Plaintiffs seek specific and detailed information regarding the Government's actions and

18  omissions in selecting the Lerdo facility and renewing its IGSA contracts every year.  Specifically,

19  Plaintiffs seek: (1) reports, on-site and off-site inspection records, and reports and statistical data on

20  complaints and medical grievances at Lerdo before the award of the 2005, 2006, 2007 and 2008

21  IGSAs with Lerdo; (2) Inspection records, investigator notes and all other materials related to DHS

22  inspection reports rating Lerdo "deficient"  and "at risk" in 2007 and 2008; (3) medical or coroner's

23  records in DHS possession indicating any injuries to immigration detainees caused by employees of

24  Lerdo; (4) limited depositions of federal defendants on the issue of Lerdo's history and qualifications

25  and the selection and renewal process DHS utilized in renewing its IGSAs with Lerdo each year,

26  despite its deficiency ratings; (5) manuals, policies, protocols and guidelines relevant to such

27  _____

28  [2] *See* http://www.nytimes.com/interactive/2010/02/23/nyregion/20100223-immig-table.html. Last visited on February 18, 2011.

PLAINTIFFS DORA BAIRES AND TEOFILO MIRANDA'S OPPOSITION TO UNITED STATES' AMENDED
MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

1  selection process, and limits to the discretion of the decision-maker; and (6) all documents involved

2  in the process resulting in the renewal of  an IGSA with Lerdo each year from 2006 to 2008.

3          Plaintiffs also seek: (1) all government records, including manuals, protocols and guidelines

4  setting forth policies or guidance with respect to the on-site  and  off-site monitoring of IGSA

5  facilities housing ICE detainees, including time, frequency and scope of monitoring, and any

6  mandatory actions related to deficiencies discovered through monitoring; (2) all records, including

7  manuals, protocols, reports and guidelines limiting the discretion of those charged with on-site and

8  off-site monitoring facilities and implementing policies related to such monitoring; (3)  limited

9  depositions of federal defendants responsible for on-site and off-site monitoring of the Lerdo facility

10  and acting upon deficiencies detected through such monitoring.

11          Without this discovery, Plaintiffs are poorly situated to determine whether Defendant's

12  employees acted in conformity with DHS policies and protocols governing the monitoring and

13  inspection of contract jails; remedial measures for addressing deficiencies at those jails; measures for

14  ensuring compliance with National Detention Standards; necessary conditions for renewing IGSA

15  contracts; and affirmative actions required in response to on-going medical grievances and safety

16  hazards.

17          Moreover, since Plaintiffs have not been afforded discovery, the Court should refuse to

18  consider the discovery Defendant offers.  A court should only rely upon matters outside of the

19  pleadings when *both* sides have had the opportunity to introduce declarations and other evidence.

20  *Rhodes v. Avon Products*, 504 F. 3d 1151, 1160 (9th Cir. 2007) (declining to consider the evidence

21  submitted in support of motion to dismiss, and instead assuming the plaintiff's allegations to be true,

22  because the trial court did not hold an evidentiary hearing).  Unless Plaintiffs are given the

23  opportunity to engage in the discovery to which they are entitled, Defendant will be able to

24  unilaterally pick and choose its own evidence without allowing any scrutiny of that evidence or the

25  opportunity for Plaintiffs to establish other evidence.  Once discovery is complete, the Government

26  may make a motion for summary judgment based on the discretionary function exception. Until

27  then, the Court should reject efforts to short-cut this litigation.

28

– 19 –

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1

**D.      Plaintiffs Have Stated Claims Of Intentional Infliction Of Emotional Distress**

2

Plaintiffs have pled sufficient facts to support a claim for intentional infliction of emotional

3

distress.  To state a claim under California law, a plaintiff must allege "(1) extreme and outrageous

4

conduct by the defendant with the intention of causing, or reckless disregard of the probability of

5

causing, emotional distress; (2) the plaintiff's suffering severe or emotional distress; and (3) actual

6

and proximate causation of the emotional distress by the defendant's outrageous conduct."

7

*Davidson v. City of Westminster*, 32 Cal. 3d 197, 200 (1982); *Tekle v. United States*, 511 F. 3d 839,

8

854-55 (9th Cir. 2007).  In order to be considered outrageous, the conduct "must exceed all bounds of

9

that are usually tolerated in a civilized community." *Id*.  Where reasonable persons may differ, the

10

trier of fact is to determine whether "the conduct has been sufficiently extreme and outrageous to

11

result in liability." *Cross v. bonded Adjustment Bureau,* 48 Cal. App. 4th 266, 283-86 (1996).

12

The allegations in Plaintiffs' Second Amended Complaint are more than sufficient to state a

13

claim.  Plaintiffs alleged that Defendant's employees showed reckless disregard of the probability

14

that Miranda and Baires would suffer emotional distress when they banished them to Lerdo, ignored

15

their pleas for medical care, and delayed authorization of specialized care based on cost-saving

16

measures.  (SAC ¶¶ 258-76)  They have satisfied their burden of pleading a viable claim.[3]

17

**E.      The Court Has Jurisdiction Over Plaintiffs Claims For Injunctive Relief.**

18

Finally, Defendant argues that Plaintiffs have failed to provide a jurisdictional basis for their

19

claims for injunctive and declaratory relief.  Not so.  Plaintiffs alleged in the complaint that "this

20

Court has authority to grant injunctive relief, declaratory relief, and other related relief, pursuant to

21

28 U.S.C. §§ 1331, 2243, and the Declaratory Judgment Act, 28 U.S.C. §§ 2301, 2202."  Moreover,

22

"federal courts have long exercised the traditional powers of equity, in cases within their jurisdiction,

23

to prevent violations of constitutional rights. *See Bell v. Hood,* 327 U.S. 678, 684 (1945)

24

(recognizing the "jurisdiction of federal courts to issue injunctions to protect rights safeguarded by

25

the constitution").

26

27

[3] Defendants include a throw-away argument that Plaintiffs emotional distress claim may be an "excluded tort" under 28 U.S.C. section 2680(h).  Defendants offer no analysis to support this one-line "argument" or identify what "excluded tort" they are referring to, thus the court should disregard it.

28

PLAINTIFFS DORA BAIRES AND TEOFILO MIRANDA'S OPPOSITION TO UNITED STATES' AMENDED
MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

1

## IV.    CONCLUSION

2        This case involves the senseless and tragic death of one asylum-seeker and the extreme pain

3   and suffering of another because of our Government's total disregard for their chronic medical

4   conditions.  The Government took these young men into its custody, which cut them off from their

5   normal medical providers.  Then, the Government banished them to a jail known for sub-standard

6   conditions and forgot about them.  The Government has a constitutional duty to provide reasonable

7   care to immigration detainees and it violated that duty.  Plaintiffs are entitled to a remedy.  The

8   Court should deny the Government's Motion to Dismiss the Second Amended Complaint and allow

9   the lawsuit to go forward.

10        DATED:  February 18, 2011.

11

12                                              REED SMITH LLP

13

14                                              By_____/s/ Jayne E. Fleming_____
                                                    Jayne E. Fleming
15                                                  Attorneys for Plaintiffs
                                                    Dora Baires, individually, and on behalf of the
16                                                  estate of Juan Carlos Baires; and Teofilo Miranda

17

18

19

20

21

22

23

24

25

26

27

28

REED SMITH LLP

A limited liability partnership formed in the State of Delaware